UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

UNITED STATES OF AMERICA,
     Plaintiff,

v.                             CASE NO. 8:21-CR-81-CEH-JSS

RUGH JAMES CLINE,
     Defendant.

_____/

## SENTENCING MEMORANDUM AND REQUEST FOR VARIANCE[1]

Mr. Cline requests this Court grant a variance based on Supreme Court precedent and the factors set forth under 18 U.S.C. § 3553.

## STATEMENT OF FACTS

On August 19, 2024, Mr. Cline entered a guilty plea to one count of engaging in illicit sexual conduct in a foreign place, in violation of 18 U.S.C. § 2423(c), pursuant to his written plea agreement with the government. *See* Docs. 127, 133. Mr. Cline's sentencing hearing is set for March 6, 2025. Doc. 151. Based on an offense level of 41 and criminal history category of I, the guidelines recommend 324 to 360 months imprisonment. *See* Doc. 155 (PSR) at ¶ 124. However, Mr. Cline has raised objections to the Presentence Report. If granted, he will be facing an offense level of 30 and a criminal history category of I. Thus, he would be facing an imprisonment range of 97 to 121 months. PSR at pp. 3-4.

## MEMORANDUM OF LAW

---

[1] The original version of this pleading was timely filed on February 27, 2025 but later removed by the Clerk of Court in error. The pleading is therefore being re-filed per the request of the Court's staff.

*Introduction*

The dilemma of Mr. Cline's sentencing is how to achieve a just resolution in a case that involves both egregious conduct and substantial mitigation. Consequently, Mr. Cline's case presents "a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *Gall v. United States*, 552 U.S. 38, 53 (2007) (citing *Koon v. United States*, 518 U.S. 81, 113 (1996)). The Indictment and PSR cast Mr. Cline as a villain deserving of retribution. The sentencing guidelines follow with a rigid matrix that only considers Mr. Cline's criminal conduct in calling for an incredibly severe sentence. Such a result makes the undersigned question if pleading guilty to child exploitation is worth it since defendants are essentially looking at spending the majority of their lives behind bars.

Nevertheless, Supreme Court precedent, in contrast to the guidelines, demands more than sentences that only consider the defendant's crime. Indeed, "[t]here is a longstanding tradition in American law, dating back to the dawn of the Republic, that a judge at sentencing considers the whole person before him or her "as an individual.'" *Concepcion v. United States,* 597 U.S. 481, 486 (2022) (citation omitted). A court must consider a wide breadth of information to ensure that the punishment will suit not merely the offense since "a court's duty is always to sentence the defendant as he stands before the court on the day of sentencing." *Pepper v. U.S.*, 562 U.S. 476 (2011).

Consistent with this obligation, 18 U.S.C. § 3553(a) requires a court to

contemplate a broad range of information in determining a defendant's sentence rather than limiting its consideration to the advisory sentencing guidelines. Thus, a court must consider seven statutory factors under § 3353(a), with the guidelines just being one of the seven factors. *See* 18 U.S.C. § 3553(a)(1)-(7).[2]

The following chapters analyze the § 3553 factors in Mr. Cline's case. Such an analysis indicates that these sentencing factors support his request for a variance. While Mr. Cline's conduct was reprehensible, there are significant mitigating factors in his case. Thus, this memorandum concludes that the imposition of a guideline sentence in Mr. Cline's case violates a court's duty to impose a sentence that is sufficient but not greater than to satisfy the purposes of § 3553(a). *See Pepper*, 562 U.S. at 476.

### Chapter 1
### Nature of the Offense and the History of the Defendant

In linking a defendant's criminal conduct with his personal history and characteristics, the first section 3553(a) factor comprehends that a defendant's criminal conduct should not be considered in isolation or even as the paramount sentencing factor. *See*, *e.g.*, *United States v. Adelson*, 441 F. Supp. 2d 506 (S.D.N.Y. 2006) (Rakoff, J.). In this way, the first factor recognizes that every case contains a narrative of "human failings that sometimes mitigate, sometimes magnify, the

---

[2] The most explicit statutory recognition of this principle states that "[n]o limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence." *See* 18 U.S.C. § 3577.

crime and the punishment to ensue." *Gall,* 552 U.S. at 53.

Mr. Cline recognizes the seriousness of his offense. He also acknowledges that his current offense constitutes a sad denouement to the life he had lived and the career he has lost. But despite his serious conduct, Mr. Cline has demonstrated exemplary qualities throughout his life. *See Letters of Support*, hereto attached as Exhibit 1 (Ex. 1). Cheryl Cowans states that after her brother graduated from law school, "he was dedicated to helping people who could not normally afford legal representation with their issues." *Id.* at *Letter of Cheryl Cowans.* Similarly, Linh Truong states that "Mr. Cline has always been a compassionate individual, a strong advocate for those less fortunate, and someone who is friendly and willing to help others in need." *Id.* at *Letter of Linh Truong.*

Mr. Cline's compassion to others also extends to his family. His mother, Debra Platt Taylor, is currently suffering from a serious illness, micro bacterium abcessus.[3] She describes the significant care that her son has provided during her debilitating bout with the disease. *See* Ex. 1 at *Letter of Debra Platt Taylor.*

> Rugh being here with me during this battle has been a godsend. He took over the house. He cooked, cleaned, did laundry, took care of the

---

[3] "*Mycobacterium abscessus* complex comprises a group of rapidly growing, multidrug-resistant, nontuberculous mycobacteria that are responsible for a wide spectrum of skin and soft tissue diseases, central nervous system infections, bacteremia, and ocular and other infections." *See* Nat'l Instit. of Health, *Mycobacterium Abscessus Complex Infections in Humans* (Sept. 21, 2015), available at https://pmc.ncbi.nlm.nih.gov/articles/PMC4550155/. In Ms. Taylor's case, her drug resistant disease has impacted her pulmonary functioning. Mr. Cline also recently learned that his mother has been diagnosed with skin cancer. Given the severe penalties he is facing and his mother's health issues, there is a strong likelihood that Mr. Cline will not see his mother again as a free man.

yard. He did everything for me. This bacteria and the medication trying to kill it has caused me to have very little energy. Some days I sleep 15 hours at a time.

*Id.*

Against such a backdrop, deconstructing the narrative of Mr. Cline's life is where the interplay between a client's characteristics and conduct becomes critical. Indeed, such a deconstruction establishes that Mr. Cline's criminal conduct should not be the sole measure of the man.

Mr. Cline was born into a home of dysfunction, abuse, and neglect. *See* PSR at ¶ 91. Growing up, Mr. Cline witnessed and experienced significant abuse and trauma in a home where his father's alcohol abuse was the norm. Mr. Cline's father was a violent alcoholic who physically abused Mr. Cline, his mother, and sister. *Id.*

In addition to his experience of abuse, Mr. Cline was also the victim of parental neglect. As noted in the PSR, Mr. Cline was left in the family home during his high school years when his parents chose to live with their new partners rather than him. *Id.*

Mr. Cline's experience of childhood abuse and neglect had a direct impact on his development. *See* Egeland, Yates, Appleyard, & van Dulmen*, The Long-Term Consequences of Maltreatment in the Early Years: A Developmental Pathway Model to Antisocial Behavior,* Child. Serv.: Social Policy Research and Practice*,* 5(4), 249-260 (2002); *United States v. Curry,* 192 F.3d 81, 84 (2d Cir. 1999) ("It seems beyond question that abuse suffered during childhood – at some level of severity – can impair a person's mental and emotional conditions"); *Santosky v. Kramer*, 455 U.S. 745, 789 (1982) (Rehnquist, J. dissenting) ("It

requires no citation of authority to assert that children who are abused in their youth generally face extraordinary problems developing into responsible, productive citizens").

Mr. Cline's exposure to abuse and neglect has a direct connection to his future criminal conduct. "National studies have shown that being abused or neglected as a child increases the likelihood of arrest as a juvenile by 53 percent and the likelihood of arrest for a violent crime as an adult by 38 percent." Widom, C.S., "The Cycle of Violence," (Research in Brief), Nat'l Instit. of Justice, U.S. Dept. of Justice (1992).

As these authorities recognize, the blueprint for Mr. Cline's conduct was written years before he committed his crime.[4] While his dysfunctional background cannot excuse his conduct, it does provide critical insight into his culpability.[5] Indeed, the Defendant's childhood reflected a human-created hell of neglect, abuse, and abandonment. The fact that he was raised in such a way demonstrates not only extreme dysfunction, but also significant parental failure.

Before leaving this section, a significant mitigating factor that should be

---

[4] *Yes, truly, for look you, the sins of the father are to be laid upon the children. Therefore I promise ye I fear you. I was always plain with you, and so now I speak my agitation of the matter. Therefore be o' good cheer, for truly I think you are damned…. Merchant of Venice*, Act III, Scene 5 (1597).

[5] The degree of a defendant's culpability in committing his crime including "his degree of intent (mens rea), motives, role in the offense, and mental illness or diminished capacity." Richard S. Frase, *Excessive Prison Sentences, Punishment Goals, and the Eighth Amendment: "Proportionality" Relative to What?*, 89 Minn. L. Rev. 571, 590 (Feb. 2005).

considered by this Court is Mr. Cline's significant acceptance of responsibility in this matter. Courts have recognized that extraordinary acceptance of responsibility may be a proper ground for a downward departure pursuant to section 5K2.0, despite section 3E1.1's express contemplation of acceptance of responsibility.

In *United States v. Stewart*, 154 F. Supp. 2d 1336, 1343 (E.D. Tenn. 2001), the Court concluded extraordinary acceptance of responsibility, such as what *Stewart* demonstrated by foregoing a meritorious motion to suppress that may have precluded her prosecution altogether, was a permissible basis for departure. The *Stewart* court ultimately concluded that Stewart's actions justified an eight-level downward departure for extraordinary acceptance of responsibility on the ground that Stewart's conduct was extraordinary, deserving of reward, and that a departure would encourage future defendants to emulate this type of conduct. *Id.* at 1344.

Here, Mr. Cline's acceptance of responsibility should be worth more than a run-of-the-mill case before the Court. Specifically, Mr. Cline cooperated fully with his return to the United States. Further, by pleading guilty, Mr. Cline saved the government substantial cost and resources, including having to pay for numerous witnesses to travel from Cambodia to the United States for trial. In addition, Mr. Cline forfeited numerous pretrial motions, including motions to suppress evidence, when he entered his guilty plea. Lastly, Mr. Cline voluntarily surrendered to the U.S. Marshals after the Court adjudicated him guilty in this case. Based on the foregoing, Mr. Cline should receive additional credit for his acceptance of

responsibility in this case.

This section's discussion demonstrates that focusing solely on Mr. Cline's criminal conduct in determining his sentence is antagonistic to the tenet that a sentencing Court must consider a wide breadth of information and the factors that sometimes mitigate the crime and punishment to ensue. In the end, moving from a focus on the guidelines' sole consideration of Mr. Cline's criminal history and conduct in favor of his complete story provides a just sentencing examination. If *Concepcion* and *Gall* have any force, the Defendant who committed crimes may be subject to condemnation, but the Defendant as he appears today is worthy of this Court's mercy.

## Chapter 2
## Just Punishment

*All in all, punishment hardens and renders people more insensible; it concentrates; it increases the feeling of estrangement; it strengthens the power of resistance.*

Friedrich Nietzsche, *The Genealogy of Morals*, essay 2, aph. 14 (1887)

The PSR's conception of the guidelines results in a prison sentence that is approximately 30 years. This is a harsh and unfair punishment. And it is a punishment, based on a rigid matrix, that merely considers the quantity of time to be served without regard to the harsh punishment that Mr. Cline has already received and will receive based on his conviction.

*Past Punishment*

Considering the harsh punishment he has already received, Mr. Cline served

1,480 days (just over four years) incarcerated in Cambodia. The U.S. Department of State has concluded that "Prison conditions throughout [Cambodia] remained harsh due to gross overcrowding, physical abuse, inadequate sanitary conditions, inadequate food, lack of clean water, and rampant corruption." U.S. Dept. of State, *2023 Reports on Human Right Practices: Cambodia* at  (2023), available at https://www.state.gov/reports/2023-country-reports-on-human-rights-practices/cambodia/, excerpt attached hereto as Exhibit 2. Concerning overcrowding in Cambodian prisons, the State Department found that "there were more than 45,000 prisoners in a 28-prison system designed to accommodate 11,000." *Id.*

Consistent with the State Department's findings, Mr. Cline's incarceration at the Siem Reap Prison was a descent into a human created hell. Cheryl Cowans, Mr. Cline's sister, describes the inhumanity and misery of Siem Reap. *See* Ex. 1 at *Letter of Cheryl Cowans*. Ms. Cowans recalled that when she visited her brother at the prison, she found him sleeping on a cement floor, along with 10 to 15 other men, in a room the size of a one car garage. *Id.*; *see also id.* at *Letter of Thida Chhay* ("The prison is in very bad condition . . .They sleep 14 men in a very small room maybe the size of a one car garage.").

During his four years at the Siem Reap Prison, Mr. Cline was subjected to every harsh problem identified in the State Department's Human Rights Report. He did not bathe or shower for four years, had no potable water, lost over 100 pounds, experienced consistent bacterial or viral infections including COVID for

which he did not receive medical care, and often paid bribes to prison staff to obtain medicine or food from outside third parties. As Ms. Cowans writes:

> The food they provided to him was often raw fish that they caught out of a green algae lake and dropped on the floor next to the hole in the ground that was the toilet. Other times they fed them rotted food. Some inmates would catch stray cats and dogs and tie them into a pillowcase and throw them in the pond to kill them so they could eat them. The only real food he would get is food he was brought by someone living outside the prison when we paid them to go feed him. There was no air conditioning anywhere and the temperatures often topped 100 degrees out. There were no showers for them to use. They could splash themselves off from a barrel of dirty water. There was no access to fresh running water at any time.

> They could not have medical care without paying a guard to take them. Even then, the medical care is what would be expected of a third world country. Rugh caught scabies and had boils on his body that almost developed into a severe infection. We would buy things for Rugh (like medication), and the guards would steal it or make him pay repeatedly to get it back. His health continued to decline and there was nothing that we could do.[6]

Ex. 1 at *Cowan Letter; see also id.* at *Letter of Thida Chay* (noting that she bought Mr. Rugh worm medication which was stolen). Similarly, Ms. Chhay, a regular visitor to the Cambodian jail, stated that:

> There is no air conditioning. There is no toilet. They use the bathroom in a hole in the ground. There are no showers. The water that they do have access to is very dirty. The water they must drink and cook with is pulled from a small dirty lake that is in front of the prison. The water is dirty brown and smells.

*Id.* at *Chhay Letter.*

After experiencing this hell for over four years, Mr. Cline's health and

---

[6] Mr. Cline still bear scars from his boils and scabies, as well as the other infections, from his time in the Cambodian prison system.

physical well-being had significantly deteriorated. Ms. Chhay, writes that prior to Mr. Cline's return to the United States:

> [while] in the deportation prison on Phnom Phen he got even more sick . . . He was so sick. He couldn't talk or stand or walk. He was drooling and didn't even recognize me. His body was shaking. He could not hold anything. It looked like he had a stroke. I asked him if he wanted to go to the hospital. He did not understand what I was asking.

*Id. Compare also* Photographs of Mr. Cline, attached hereto as Exhibit 3 (presenting photographs of Mr. Cline, including prior to and after his incarceration in Cambodia).

When he finally returned to the United States, Mr. Cline's deteriorated and compromised state persisted. He was hospitalized for one week and the medical ward at the Pinellas County Jail for an additional two weeks due to his severely impaired physical and medical condition. *See* Ex. 1 at *Letter of Debra Platt Taylor* ("When he came back from Cambodia he was so close to death from malnutrition").

A disturbing aspect of Mr. Cline's inhumane detention in Cambodia was the lassitude, if not complicity, of the United States Government when confronted with the horrors of the Defendant's situation. *See*, *e.g*., Ex. 1 at *Letter of Thida Chhay* (noting that when  foreign nationals from England, Australia, and the Netherlands were arrested, "[t]heir embassies tried to help so much, but U.S. Embassy did nothing to help [Mr. Cline]"); *see also Letter of Andrew C. Searle, Esq. and Fritz Scheller, Esq.*, (putting the government on notice as to the conditions Mr. Cline

was enduring in Cambodia), attached hereto as Exhibit 4. Perhaps, it is not surprising then that the same Government supports the imposition of a guideline sentence that inflicts another harsh and cruel punishment.

While the guidelines, and the Government to its credit, recognize that this Court can credit Mr. Cline for the number of days (1,480) he served in Cambodian prison through a downward departure. PSR at ¶¶ 18, 140. Such a "credit" can never account for the inhumanity, degradation and torture of those days. Notably, other federal courts have granted variances based on a defendant's difficult or harsh pretrial detention. *See United States v. Pressley*, 345 F.3d 1205 (11th Cir. 2003) (where defendant spent six years in presentence confinement, of which five years were in 23-hour a day lockdown and where he had not been outside in five years, district court erred in holding that departure not available); *United States v. Carty*, 264 F.3d 191 (2nd Cir. 2001) (defendant's pre-sentence confinement in Dominican Republic where conditions were bad may be a permissible basis for downward departures from sentencing guidelines); *United States v. Speed Joyeros, S.A.*, 204 F. Supp. 412, 441 (E.D.N.Y. 2002) ("A court may depart if the defendant has suffered from unusual stress due to a lengthy or particularly stressful incarceration").

When considering Mr. Cline's suffering in Cambodian prison as a basis for a variance, *United States v. Francis*, 129 F.Supp.2d 612, 616 (S.D.N.Y. 2001) is particularly instructive. In *Francis*, the Defendant asserted that the deplorable conditions of his incarceration at the Hudson County Correctional Center (HCCC)

supported his request for a departure. *See Francis*, 129 F.Supp.2d at 613. The Defendant asserted that such deplorable conditions included such minor inconveniences as inadequate commissary, television and recreation. *Id.* at 616. But his other complaints concerned overcrowding in the intake cells; inadequate hygiene; a lack of reading materials in Spanish; and a lack of programs or work opportunities. *Id.* His other complaints were spoiled and unsanitary food that did not meet basic nutritional needs and theft of personal property. *Id.* at 616-617. While incarcerated at HCCC, the Defendant lost twenty to twenty-five pounds. *Id.* at 617. In granting a departure based on the conditions of the defendant's pretrial custody, the district court concluded "that the thirteen and a half months that Defendant served at HCCC were under qualitatively different conditions than those of pre-sentence detainees in federal facilities operated by the Bureau of Prisons." *Id.* at 619.

Notably, Mr. Cline experienced the problems identified in *Francis* as supporting a departure based on the stress caused by the conditions of a defendant's pretrial incarceration. But more notably, Mr. Cline's incarceration was far worse.[7] To be sure, Mr. Cline's inhumane treatment not only violated the Eighth Amendment prohibition on cruel and unusual punishment but also violated the

---

[7] While the defendant in *Francis* experienced 13 and 1/2 months of difficult incarceration at HCCC, Mr. Cline's imprisonment lasted over four years. His medical care was not inadequate. Rather, it was non-existent. Similarly, his rotten food, hole for a toilet, and his inability to wash for four years goes far beyond the conditions cited in *Francis* as supporting a departure.

human rights standards in most countries throughout the world. Awarding him a mere day for day credit for the time he spent in a Cambodian prison turns a blind eye to that country's abuses and does not account for the horror he endured.

*Future Punishment*

While a variance based on Mr. Cline's pretrial imprisonment in Cambodia accounts for the cruelty of the punishment he has already suffered for his crimes, it does not account for the harshness of the future retribution he will endure. Mr. Cline will be subject to substantial punishment for the offense beyond his days in a prison cell. *See* Hugh LaFollette, *Collateral Consequences of Punishment: Civil Penalties Accompanying a Formal Punishment*, 22 J. of Applied Phil., 241, 244-46 (2005) (discussing and critiquing on proportionality grounds retributivist justification of collateral consequences). In imposing a just sentence, this Court should also consider the significant punishment resulting from the collateral consequences of Mr. Cline's felony conviction.

Prior to the instant offense, Mr. Cline had no felony record. Nevertheless, based on his felony conviction, Mr. Cline will face an overwhelming number of collateral consequences. A congressional report authored by the United States Government Accountability Office (GAO) demonstrates that there are 641 collateral consequences of a nonviolent felony conviction. *See* GAO Report 17-691, NONVIOLENT DRUG CONVICTIONS, *Stakeholders Views on Potential, Actions to Address Collateral Consequences*, (Sept. 2017), summary excerpt attached hereto as Exhibit 5. Of these 641 collateral consequences, 497 (78%) of them may

last a lifetime. *See id.*

Recognizing the effect of collateral consequences of a felony conviction, federal judges should account for such an impact at sentencing. *See United States v. Nesbeth*, Case No. 1:15-cr-00018, 2016 WL 3022073, at *1 (E.D.N.Y May 24, 2016) (Block, J.) (varying downward from guideline range of 33 to 44 months imprisonment to one-year of probation for a drug defendant based in part on the number of statutory and regulatory consequences he faced as a convicted felon). The *Nesbeth* Court concluded that "sufficient attention has not been paid at sentencing . . . to the collateral consequences facing a convicted defendant. And I believe that judges should consider such consequences in rendering a lawful sentence." *Id.* In granting a variance in *Nesbeth*, the court asserted that the collateral effects of a criminal conviction can be "devastating" to a defendant. *Nesbeth*, 2016 WL 3022073, at *1. As Judge Block concluded, "[t]oday, the collateral consequences of criminal convictions form a new civil death." *Id.* at *3.

One of the most significant collateral consequences for Mr. Cline at age 44, will be his lifelong registration as a sex offender. Such registration constitutes a significant punishment. *United States v. Autery,* 555 F.3d 864 (9th Cir. 2009) (where defendant convicted of possession of child pornography, court's *sua sponte* variance to probation not unreasonable in part because of onerous conditions of probation including registration for life as sex offender, prohibitions on location and affiliations, and restrictions on use of computer).

In addition to his sex offender registration, such a status will have a

significant impact on his future employment prospects and his relationships. *See* Economist, *Unjust and Ineffective* (August 6, 2009). Mr. Cline's stigma as a sex offender is a significant punishment that will impact all aspects of his future existence. Such a result supports a variance in Mr. Cline's case. *See, e.g., United States v. Wachowiak*, 412 F. Supp. 2d 958, 963-964 (E.D. Wis. 2006) *aff'd* 496 F.3d 744 (7th Cir. 2007) (granting variance based in part on the recognition that "the guidelines failed to account for the significant collateral consequences defendant suffered as a result of his conviction).

### Chapter 3
### Deterrence

*"No punishment has ever possessed enough power of deterrence to prevent the commission of crimes."*

Hannah Arendt, *Eichmann in Jerusalem*, Epilogue (1963)

The preceding discussion established that a lengthy prison sentence is inconsistent with a just sentence. In turn, this section addresses the question of whether a long prison sentence will accomplish the § 3553 factor of deterrence. Such an analysis requires an analysis of both general and specific deterrence.

*General Deterrence*

The belief that lengthy prison sentences are effective in deterring crime is the last refuge for the misled. Indeed, it is a false narrative that is not supported by empirical study or evidence.[8] *See* Gary Kleck and J.C. Barnes, *Deterrence and*

---

[8] Limited narratives have a profound and negative impact on decision-making. *See*, *e.g*., Dolan & Henwood, *Five Steps Toward Avoiding Traps in Narrative Decision-Making*,

*Macro-Level Perceptions of Punishment Risks: Is There a "Collective Wisdom"*?, 59 Crime & Delinquency 1006, 1031-33 (2013) (concluding that "increases in punishment levels do not routinely reduce crime through general deterrence mechanisms, because the fundamental link between punishment levels and perceptions of punishment levels appears to be weak to nonexistent").

Nevertheless, federal prosecutors consistently argue this factor in support of harsh sentences. And why wouldn't they? If you consistently assert that prison sentences are necessary to prevent future crimes, then minimum mandatories and harsh guideline sentences are entirely rationale. But the troubling aspect of the premise is not only found in its invalidity, but also in its effectuation of mass incarceration. *See* Dr. Oliver Roeder et al., *What Caused the Crime Decline*?, Brennan Center for Just., 22-23 (Feb. 12, 2015). To be sure, there is no correlation between punishment and reductions in crime. *See id.* For the Government to argue otherwise is expected but hypocritical, nonetheless. Indeed, the Department of Justice (DOJ) has concluded that incarcerating defendants is not an effective means of deterrence. *See* U.S. Dept. of Justice, Nat'l Inst. of Justice, *Five Things About Deterrence* (July 2014), attached hereto as Exhibit 6. The DOJ has further concluded that even increasing the severity of punishment does little to deter

---

Nat'l Inst. of Health (Aug. 12, 2021); *see also* Akira Kurosawa, *Rashomon* (Daiei Films release on Dec. 26, 1951, in the U.S.). But born out of fear, such narratives satisfy the human desire for certainty. *See*, *e.g*, Maria Konnikova, *Why We Need Answers*, The New Yorker (Apr. 30, 2013).

crime.

*Specific Deterrence*

The likelihood that the defendant "will engage in future criminal conduct [is] a central factor that district courts must assess when imposing sentence." *Pepper,* 562 U.S. at 492. Having established that prison sentences, regardless of length, have no impact on general deterrence, this section demonstrates that the factor of specific deterrence also supports Mr. Cline's request for a variance. The first part of this section focuses on studies establishing that incarceration has no effect on recidivism. The second part asserts that Mr. Cline's history and characteristics prove that he will never commit another crime.

a.      *The relationship between incarceration and recidivism*

As in the case of general deterrence, empirical evidence does not establish a relationship between sentence length and specific deterrence, regardless of the type of crime. *See* National Institute of Corrections*, Myths and Facts, Why Incarceration is Not the Best Way to Keep Communities Safe* (2016), attached hereto as Exhibit 7 (Ex. 7). To be sure, the best available evidence establishes that imprisonment does not reduce recidivism more than non-custodial sanctions. Francis T. Cullen et al., *Prisons Do Not Reduce Recidivism: The High Cost of Ignoring Science*, 91 Prison J. 48S, 50S-51S (2011). There is strong evidence that prison - by disrupting education and employment, reducing prospects for future employment, weakening family ties and exposing less serious offenders to older more serious offenders - leads to increased recidivism. *See Criminogenic Effects*

*of Imprisonment: Evidence from State Panel Data 1974-2002,* 6 Criminology & Public Policy 589 (2007). *see also* Friedrich Nietzsche, *The Genealogy of Morals*, essay 2, aph. 14 (1887) ("All in all, punishment hardens and renders people more insensible; it concentrates; it increases the feeling of estrangement; it strengthens the power of resistance").

Thus, the most effective way to promote public safety and ensure that convicted persons can lead law-abiding lives is through broad use of non-incarceration sentences, especially since "incarceration does little to change a person's behavior" and persons sentenced to prison have higher recidivism rates than those sentenced to community corrections. Ex. 7 at 1, 4.

b.    *Mr. Cline's lower risk of recidivism*

Mr. Cline is 44 years old and has a criminal history category of I. Moreover, he is college educated, has been employed throughout his life, and does not have a substance abuse problem. Because of his education, employment history, and lack of substance abuse and criminal history, Mr. Cline poses a lower risk of recidivism. *See* U.S. Sent. Comm'n, *Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines* at 12-13 (May 2004).[9]

In imposing the least sufficient sentence to account for the need to protect the public from further crimes of Mr. Cline, this Court should consider the statistically low risk of recidivism presented by him. *United States v. Urbina*, slip

---

[9] Mr. Cline's low risk of recidivism is underscored by the fact that he served 465 days on house arrest without incident.

op., 2009 WL 565485, *2-3 (E.D. Wis. Mar. 5, 2009) (considering low risk of recidivism indicated by defendant's lack of criminal record, positive work history, and strong family ties).

### Chapter 4
### Educational, Medical Care, or Other Correctional treatment

> Judges carry the heavy burden of depriving individuals of their liberty. But the Bureau of Prisons shoulders the constitutional burden of protecting the remaining rights of the incarcerated while in custody.

*United States v. Bardell*, 634 F.Supp.3rd 1083, 1084 (M.D. Fla. 2022).

A long prison sentence is not necessary to provide Mr. Cline with educational correctional treatment. Indeed, Mr. Cline does not have a substance abuse problem and is college educated. Recognizing the seriousness of his transgression, however, Mr. Cline requests sex offender treatment.

In addition to sex offender treatment, Mr. Cline requires vigilant medical care. Mr. Cline suffers from bradycardia,[10] Hepatitis C,[11] and hypotension.[12] He suffered a stroke in the past and now requires a dual chamber pacemaker. Furthermore, as previously noted, Mr. Cline's medical condition was so compromised that he spent three weeks in a Florida hospital and a medical ward

---

[10] Bradycardia is a slow heart rate. See Mayo Clinic, *Bradycardia*, available at https://www.mayoclinic.org/diseases-conditions/bradycardia/symptoms-causes/syc-20355474

[11] Hepatitis C is a viral infection that "can lead to serious liver damage." *See* Mayo Clinic, *Hepatitis C,* available at https://www.mayoclinic.org/diseases-conditions/hepatitis-c/symptoms-causes/syc-20354278

[12] Hypotension is low blood pressure. Mayo Clinic, *Hypotension*, available at https://www.mayoclinic.org/diseases-conditions/low-blood-pressure/symptoms-causes/syc-20355465

after his return to the United States.

Considering these facts, there should be little doubt that Mr. Cline requires medical care while in the warm embrace of the Federal Bureau of Prisons (BOP). Thus, a significant section 3553(a) consideration in this case is whether Mr. Cline will receive effective care from BOP based on his health concerns. *See, e.g.,* 18 U.S.C. § 3553(a)(2)(D) (stating that the sentence imposed must ensure that needed medical care is provided "in the most effective manner"). This factor reflects the established legal tenet that prisons are required to provide medical care to their inmates. *See*, *e.g.*, *Estelle v, Gamble*, 429 U.S. 97 (1976).

Despite the requirements of the Eighth Amendment, the BOP consistently fails to meet the standard of adequate medical care for its inmates. And this failure has persisted over a significant period. An audit by the Office of the Inspector General found systemic deficiencies in the Bureau of Prisons' delivery of health services. The Inspector General found that in numerous instances, the BOP failed to "provide required medical services to inmates," including inadequate treatment for chronic conditions, failure to properly monitor side effects of medication, allowing unqualified providers to render medical services, and failure to meet performance target levels on treatment of serious conditions. *See* U.S. Dep't of Justice, OIG, *The Federal Bureau of Prison's Efforts to Manage Inmate Health Care* ii-xix, 32-34 (2008), *available at* https://oig.justice.gov/reports/BOP/a0808/final.pdf.

Since that 2008 audit, things have not changed. *See* American Ass'n. of

Family Physicians, *Incarceration and Health: A Family Medicine Perspective* (July 2021) ("Inmates in correctional facilities have significantly higher rates of disease than the general population, and correctional facilities are often an ill-equipped provider for the medically underserved") (citations omitted), available at https://www.aafp.org/about/policies/ all/incarceration.html. *See also* Meg Anderson, *Lawmakers push for federal prison oversight after reports of inadequate medical care*, NPR (Dec. 12, 2023), available at https://www.npr.org/2023/12/12/1218627629/lawmakers-push-for-federal-prison-oversight-after-reports-of-inadequate-medical-.

The DOJ Office of Inspector General recently issued another report in February 2024, concerning inmate deaths in the BOP from 2014 to 2021. *See* U.S. Dep't of Justice, OIG, *Report on Issues Surrounding Inmate Deaths in Federal Bureau of Prisons Institutions* (Feb. 15, 2024), attached hereto as Exhibit 8 (Ex. 8). The OIG again found deficiencies in the BOP's provision of health care to inmates. Ex. 8 at 1. *See also* Meg Anderson, *1 in 4 Inmate Deaths Happen in the Same Federal Prison. Why?* NPR (Sept. 23, 2023) (finding many serious illnesses went untreated at various BOP facilities until it was too late).

Recognizing the problem with the provision of medical care by the BOP, district courts have imposed lesser sentences based on the inadequacy of healthcare in the BOP. *See United States v. Martin*, 363 F.3d 25, 50 (1st Cir. 2004) *United States v. Gee,* 226 F.3d 885 (7th Cir. 2000) (sentencing court's downward departure under §5H1.4 based on defendant's health condition was not abuse of

discretion and BOP letter stating that it could take care of any medical problem "was merely a form letter trumpeting [BOP] capability").[13]

# Chapter 5
## The Guidelines

*If you take a matrix to factor offense severity, overlay it with mandates born of popular outrage, and tailor it purportedly to address almost every eventuality, you get "justice" dictated in advance, marked by visceral condemnation, and based on the pretense of omniscience.*

*United States v. Williams*, 372 F.Supp.2d 1335, 1337-1338 (M.D. Fla. 2005) (Presnell, J.).[14]

The guidelines recommend an imprisonment sentence of 10,950 days. This recommendation is owed little deference.[15] Indeed, the guideline recommendation is draconian and absurd. Promulgated to provide sentencing consistency, the sentencing guidelines have achieved its goal through the consistent imposition of sentences that have been both irrational and unjustly harsh.

The guidelines pose a particular risk for Mr. Cline since their rigid matrix does not account for the unique circumstances of his case. Moreover, in accounting

---

13 Given the drastic cuts to federal spending currently being implemented by the recently created Department of Government Efficiency, the undersigned anticipate that BOP's inability to provide adequate medical care to inmates such as Mr. Cline will not improve, and in fact, worsen, in the coming years, if not decades.

14 Although *Williams* was reversed by the Eleventh Circuit in *United States v. Williams*, 456 F.3d 1353 (11th Cir. 2006), the Eleventh Circuit's decision was overruled by the United States Supreme Court. *See Kimbrough v. United States*, 552 U.S. 1353 (2007). =

15 As recognized in *Gall*, district courts "may not presume that the Guidelines range is reasonable." 552 U.S. at 49. *See also Rita v. United States*, 551 U.S. 338, 351 (2007) ("[T]he sentencing court does not enjoy the benefit of a legal presumption that the Guidelines sentence should apply.").

for all aspects of his criminal conduct, they promote certain absurdities at arriving at a severe sentence. A fundamental absurdity and injustice in Mr. Cline's case is the PSR's use of the pattern enhancement and the pseudo counts in tandem to punish him for the same conduct twice, and for crimes he never pled to. *See* PSR at ¶¶ 71-73, 75.

But such absurdities are not the only issue with a rigid application of a guideline sentence in Mr. Cline's case. Indeed, a mechanical application of the guidelines, which solely rely on his offense conduct as reflected in a rigid sentencing matrix, does not account for the unique factors that mitigate Mr. Cline's sentence – a result that is antagonistic to § 3553(a), as well as *Koon*. In placing offense conduct above all else, the guidelines do not account for Mr. Cline's exemplary characteristics. *See* Chapter I, *supra*. They do not account for the cruel and unusual punishment he received already for this crime in a Cambodian prison. *See* Chapter 2, *supra*. They do not account for the significant impact of the collateral consequences of his conviction. *Id*. They do not account for Mr. Cline's low risk of recidivism. *See* Chapter 3, *supra*. They do not account for his need for medical treatment. *See* Chapter 4, *supra*. And as this section notes, they do not account for the absurdities inherent in his advisory guideline range.

The inability of the guidelines to meet the requirements of § 3553 constitutes a grave failure in a case involving an offender like Mr. Cline. To be sure, a mechanical application of the guidelines in his case is necessarily inconsistent with a just sentencing process as contemplated by Supreme Court precedent and the §

24

3553(a) factors. Such a technical approach would only prove that injustice not always occurs through the impact of cataclysmic judicial decisions but often flows from the tide of quiet bureaucratic choices made without foresight or contemplation.[16]

## CONCLUSION

Based on the foregoing arguments, Mr. Cline requests a variance in his sentence.

Respectfully submitted,

*/s/ Andrew C. Searle*
Andrew C. Searle
Florida Bar Number 0116461

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of Court by using the CM/ECF system, which will send a notice of electronic filing to all parties this 28th day of February 2025.

*/s/ Andrew C. Searle*
Andrew C. Searle
Florida Bar Number 0116461
Searle Law P.A.
200 East Robinson Street, Suite 1150
Orlando, Florida 32801
Telephone: 407-952-0642
Email: andrew@searle-law.com

---

[16] The greatest evil is not now done in those sordid 'dens of crime' that Dickens loved to paint. It is not done even in concentration camps and labor camps. In those we see its final result. But it is conceived and ordered (moved, seconded, carried, and minuted) in clean, carpeted, warmed, and well-lighted offices, by quiet men with white collars and cut fingernails and smooth-shaven cheeks who do not need to raise their voice. C.S. Lewis, The Screwtape Letters at xxxvii (1961 ed.).