UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

UNITED STATES OF AMERICA

v.                                              CASE NO. 8:21-cr-00081-CEH-LSG

RUGH JAMES CLINE

## UNITED STATES' SENTENCING MEMORANDUM

The United States files this sentencing memorandum requesting that this Court sentence the Defendant, Rugh James Cline, to a guidelines sentence of 235 to 293 months' imprisonment[1]. In support thereof, the United States submits as follows:

### I. Procedural Background

On August 19, 2024, the Defendant pleaded guilty to count one of the superseding indictment, engaging in illicit sexual conduct in a foreign place with a minor, in violation of 18 U.S.C. § 2423(c). Doc. 127, 133. This Court accepted the Defendant's guilty plea and adjudicated him guilty on September 27, 2024. Doc. 139.

### II. Presentence Investigation Report

On February 28, 2025, the U.S. Probation Office issued its final PSR. Doc. 159. Based upon U.S. Probation's calculations, the total offense level is 41, combined with a criminal history category of I, the guideline imprisonment range is 324 to 405

---

[1] Based upon the government's letter to Probation dated February 18, 2025, and the defense position on the guidelines, the government's recommendation is based upon an anticipated guideline calculation at sentencing of an offense level 38 and a guideline range of 235-293.

months. PSR ¶ 124. As to count one, the statutorily authorized maximum sentence is 30 years, which is less than the maximum of the guideline range; therefore, the guideline range is 324 to 360 months. *Id*; USSG §5G1.1. The statute requires a term of supervised release of five years; therefore, the guideline requirement for a term of supervised release is five years to life. USSG §5D1.2(b)(2). PSR ¶ 126.

### III. Factual Background

As he has now admitted under oath, Cline went to Cambodia, in February 2019. During this trip, he met the victims at local markets. The four victims were between 11-years-old and 14-years-old at the time. These victims were impoverished children begging on the street when Cline, then a barred Florida attorney, paid them to engage in sexual contact with him, some on multiple occasions.

In February 2019, Cline took P.V. and Pi.R., both 11-years-old at the time, to a room he was renting in Siem Reap. Cline then removed his pants and forced P.V. and Pi.R. to masturbate his penis until he ejaculated. (*See Exhibits A and B, Birth Certificates for P.V. and Pi.R.*) Cline paid both children in U.S. currency. On another occasion around the same time, Cline made 14-year-old N.T. and 11-year-old P.V. masturbate his penis, while 14-year-old Ph.R. waited outside. That time, Cline also instructed N.T. to remove her shirt while inside his room. Cline again paid the victims in U.S. currency. On yet another occasion, Cline had 11-year-old Pi.R. and 14-year-old Ph.R. again masturbate his penis, after which he again paid them in U.S. currency.

After a break, during which Cline was traveling elsewhere, Cline returned to Siem Reap, Cambodia, in May 2019, and proceeded to sexually assault the victims on multiple additional occasions. One time, Cline paid the 14-year-olds, N.T. and Ph.R., as well as the 11-year-old Pi.R., to masturbate him and again requested the victims remove their shirts and expose their breasts while doing so. Cline also touched the victims' breasts on at least one occasion. Cline used his cell phone to take non-sexually explicit photographs of the victims while inside his room. Cline also showed these victims adult pornography on his cell phone.

On May 20, 2019, the Cambodian National Police (CNP) detained and arrested Cline for sexually assaulting the victims. Following Cline's arrest, pursuant to lawful Cambodian procedures, Cline's laptop and cell phone were seized and searched. The FBI subsequently reviewed the digital extraction of Cline's Samsung Galaxy cellphone performed by CNP. The images located on the Galaxy cellphone included a photo, identified by N.T., depicting N.T. shirtless, with her back turned to Cline at the foot of his bed inside one of his rented rooms, with Cline's foot visible in the photograph. Pursuant to a federal search warrant obtained in June 2023, when Cambodia transferred possession of the seized devices to FBI, the FBI performed a digital extraction of Cline's laptop and accompanying hard drive. The FBI observed numerous images and videos of child sexual abuse material on Cline's laptop. The FBI also located images of the victims inside at least one of his rented rooms in Siem Reap, as well as out in public in Siem Reap.

## IV. Argument for a Guidelines Sentence

Although this Court may not presume that a guidelines sentence is reasonable, the guidelines remain a significant and pivotal component of the sentencing process. *United States v. Delva*, 922 F.3d 1228, 1257 (11th Cir. 2019); *United States v. Hunt*, 526 F.3d 739, 746 (11th Cir. 2008) ("[W]hile we do not presume that a sentence falling within the guidelines range is reasonable, we ordinarily expect it to be so."). This Court therefore "must first calculate the Guidelines range, and then consider what sentence is appropriate for the individual defendant in light of the statutory sentencing factors, 18 U.S.C. § 3553(a), explaining any variance from the former with reference to the latter." *Nelson v. United States*, 129 S. Ct. 890, 891-92 (2009).

Section 3553(a)(1) provides that, in determining a sentence, this Court must consider the nature and circumstances of the offense, as well as the history and characteristics of the defendant. Additional factors outlined in section 3553(a)(2) include the need for the sentence to reflect the seriousness of the offense; to promote respect for the law; to provide just punishment for the offense; to afford adequate deterrence to criminal conduct; to protect the public from further crimes of the defendant; and to provide the defendant with needed education or vocational training, medical care, or other corrective treatment in the most effective manner. 18 U.S.C. § 3553(a)(2). Consideration of these factors necessitates a guidelines sentence.

### A. Variances requested by Defense

This Court should deny the downward variances requested by the defense because the sentencing guidelines adequately account for appropriate adjustments in

4

sentence. The defense requests a variance based on three factors: (1) the harshness of his pretrial detention in Cambodia; (2) the trauma he experienced in childhood; and (3) extraordinary acceptance of responsibility.

1. Incarceration in Cambodia

The defense requests a variance based on the conditions of his pretrial detention in Cambodia. Because the United States has already agreed not to oppose the defense's request for credit for time served by the Defendant in a Cambodian prison pursuant to USSG §5K2.23, no additional downward variance is warranted.

Nor do the conditions described by the Defendant warrant any additional variance. Although the law is clear in this Circuit that conditions of pretrial confinement may provide a basis for variance, such a variance has been reserved for only the most extreme of cases. *United States v. Pressley*, 345 F.3d 1205 (11th Cir. 2003) (holding, in a pre-*Booker* analysis, that conditions of pretrial confinement could be grounds for a downward departure and remanding to determine whether Pressley's conditions—six years in presentence confinement, five of which were in 23-hours-a day lockdown where he was not allowed to go outside—were sufficiently extraordinary to warrant a departure); *United States v. Pressley*, Criminal Case No. 1:95-cr-189, Doc. 306 (N.D. Ga. Aug. 28, 2006) (noting the Court found a variance was appropriate for Pressley); *United States v. Oliveros*, 376 F. App'x 896, 901 (11th Cir. 2010) (no abuse of discretion for court to decline a downward variance for, among other reasons, harsh conditions in Mexican prison while awaiting extradition,

which included significant weight loss[2]); *United States v. Lopez*, 685 F. App'x 861 (11th Cir. 2017) (finding no reversible error where court declined a downward departure or variance due to the conditions in Nicaraguan jail while awaiting extradition, which included seeing people get tortured and killed, limited or no access to the outdoors, having to eat with his hands, and fainting in jail[3]); *United States v. Valencia*, 556 F. App'x 916 (11th Cir. 2014) (declining to review the district court's denial of a downward departure based on conditions during the Defendant's nine-year confinement in Mexican prison while awaiting extradition, which included being kept in isolation for 23 hours, lights on 24/7, "inadequate and spoiled food," a toilet that was a hole in the floor that would overflow onto the cell floor, and "a proliferation of insects, rodents, and snakes"[4]); *compare Emmanuel v. United States*, No. 10-81470-Civ, 2011 WL 13298741 (S.D. Fla. Aug. 29, 2011) (noting a downward departure was granted where the defendant was held in lockdown in a Jamaican prison in a 5 by 13 foot cell with eight men per cell with no mattress or toilet, feces and urine were on the restroom floors which contained only three toilets with no running water for approximately 230 men, and using the restroom at night

---

[2] Facts of conditions in the Mexican prison were not detailed in the opinion but have been obtained from the appellate brief of the defendant. *U.S. v. Oliveros*, Brief of the Appellant Omar Oliveros, 2010 WL 341257 (Jan. 4 2010).

[3] Facts of conditions in the Nicaraguan prison were not detailed in the opinion but have been obtained from the appellate brief of the United States. *United States v. Lopez*, Brief for the United States, 2016 WL 7448124 (Dec. 23, 2016).

[4] Facts of conditions in the Mexican prison were not detailed in the opinion but have been obtained from the defendant's motion for downward variance. *United States v. Valencia*, Motion for Downward Departure Based on Pre-Trial Conditions of Incarceration, Doc. 2125 (image at Doc. 2124), Case No. 99-06153 (S.D. Fla. Dec. 18, 2012).

required urinating into a bottle or defecating into a piece of paper[5]). Indeed, this Court has noted that conditions such as windowless cell and eating on the floor with occasional, but not ongoing, incidences of overflowing toilets and exposure to fecal matter does not rise to the level of "extremely harsh conditions" necessitating a downward departure. *Fontalvo-Pelaez v. United States*, No. 8:21-cv-1398, 2024 WL 1703108 (M.D. Fla. Apr. 19, 2024).

Here, the Defendant has not provided evidence of conditions in Cambodia that rise to the level warranting a downward departure. That is particularly the case where, as here, the defendant is expected to receive credit for time served pursuant to USSG §5K2.23, a discretionary provision that allows the court where "appropriate" to provide credit for time served that would not otherwise count towards the instant sentence and which must be "fashioned to achieve a reasonable punishment for the instant offense." A reasonable punishment here is one that provides credit for time-served but no additional departure.

 2. Allegations of past trauma

According to the PSR and his objections, the defendant made a number of disclosures of past domestic abuse when he was a child for which he now seeks a downward variance. The defendant's allegations are distressing, but unfortunately at this point they can be neither proven nor rebutted. To the extent that the defendant

---

[5] Facts of conditions in the Mexican prison were not detailed in the opinion but have been obtained from the defendant's motion for downward departure. *United States v. Emmanuel*, Motion and Memorandum of Law for Downward Departure, Doc. 472, No. 02-80192-CR, (S.D. Fla. Jan. 5, 2007).

7

is suggesting that there is a correlation between his alleged past experiences and his later engaging in serial, sexually exploitative conduct with minors, however, this suggestion is without support.

In any event, it is unnecessary for the Court to delve into the details of the defendant's claims of abuse. His alleged victimization does not justify or excuse his current conduct. If anything, it should make the defendant more keenly aware of the lasting impacts that being a victim of child abuse can have on a person. The United States thus respectfully recommends that the appropriate response to the defendant's claims is to encourage that he receives services and counseling while simultaneously imposing a substantial sentence to reflect the seriousness of his crimes and the danger he poses to others.

3. "Extraordinary" Acceptance of Responsibility

The defense requests a variance for what he deems "extraordinary" acceptance of responsibility; however, the defendant has not shown such extraordinary acceptance. The "heartland" of cases in which USSG § 3E1.1 is applied consists of cases in which a defendant admits the factual basis of his or her conduct, recognizes his or her guilt, pleads guilty, and changes his or her plea sufficiently prior to trial so that the government is able to avoid preparing for trial. Here, Cline is entitled to the three-levels contemplated by the Guidelines, but his acceptance of responsibility is by no means "extraordinary."

Cline claims "extraordinary" acceptance by cooperating with his return to the United States and voluntary surrender to the U.S. Marshalls after being adjudged

is suggesting that there is a correlation between his alleged past experiences and his later engaging in serial, sexually exploitative conduct with minors, however, this suggestion is without support.

In any event, it is unnecessary for the Court to delve into the details of the defendant's claims of abuse. His alleged victimization does not justify or excuse his current conduct. If anything, it should make the defendant more keenly aware of the lasting impacts that being a victim of child abuse can have on a person. The United States thus respectfully recommends that the appropriate response to the defendant's claims is to encourage that he receives services and counseling while simultaneously imposing a substantial sentence to reflect the seriousness of his crimes and the danger he poses to others.

3. "Extraordinary" Acceptance of Responsibility

The defense requests a variance for what he deems "extraordinary" acceptance of responsibility; however, the defendant has not shown such extraordinary acceptance. The "heartland" of cases in which USSG § 3E1.1 is applied consists of cases in which a defendant admits the factual basis of his or her conduct, recognizes his or her guilt, pleads guilty, and changes his or her plea sufficiently prior to trial so that the government is able to avoid preparing for trial. Here, Cline is entitled to the three-levels contemplated by the Guidelines, but his acceptance of responsibility is by no means "extraordinary."

Cline claims "extraordinary" acceptance by cooperating with his return to the United States and voluntary surrender to the U.S. Marshalls after being adjudged

guilty. These factors are already considered within USSG § 3E1.1, Commentary Application Note 1.D ("voluntary surrender to authorities promptly after commission of the offense."). The defense cites an out of circuit case, *United States v. Crumb*, in support of his position. In *Crumb*, the defendant was given a variance for extraordinary acceptance when surrendering to authorities nine days after he was ordered to surrender. 902 F.2d 1337, 1339-40 (8th Cir. 1990). This case, however, was decided before an amendment to the guidelines increased the adjustment from two to three levels based on a defendant's willingness to plead guilty and surrender voluntarily. In this case, the already applied three-level reduction for acceptance of responsibility provided by § 3E1.1(b) adequately covers Cline' situation.

Cline also cites a non-binding case of *United States v. Stewart*, 154 Supp. 2d 1336 (E.D. Tenn. 2001), for the proposition that foregoing a meritorious motion to suppress warranted a variance for extraordinary acceptance of responsibility. The *Stewart* case is distinguishable; in *Stewart*, the Court held that Stewart's involvement in the offense was discovered as the direct result of an unlawful search. *Id*. at 341. Stewart declined to pursue Fourth Amendment remedies and instead, entered an unconditional guilty plea. At the time of Stewart's arraignment, the Court had already entered an Order granting a co-defendant's motion to suppress all evidence seized in the unlawful search and subsequent statements obtained as a result. *Id*. The Court considered that although Stewart would have succeeded on a motion to suppress, at no time did she seek to withdraw her plea and faced substantial punishment. *Id*. The Court considered Stewart's actions equivalent to a departure

based on "voluntary disclosure of an offense that would not have been discovered otherwise." *Id*. at 342. This was not such a case; Cline did not voluntarily disclose criminal activity that would not otherwise have been discovered. And, although Cline did file numerous motions, there was no indication from the Court, such as in *Stewart*, that these motions would have been meritorious. In fact, the Court had already denied some of the defendant's motion to suppress (Doc. 99).

Finally, Cline has cited no factor which warrants acceptance beyond that contemplated by the Guidelines. While the government did save the expense of foreign witnesses traveling to the United States for trial, such expense is contemplated within the three-level reduction already granted to Cline. By the time of Cline's guilty plea, the government had already begun trial preparations by spending numerous hours speaking with the minor victims in this case, thereby forcing them to relive the trauma of their sexual abuse.[6] Furthermore, Cline is also maintaining an objection to facts relevant to his offense of conviction. USSG §3E1.1, Commentary Application Note 1.A. and 3. Despite knowing when he sexually abused P.V., and being provided the birth certificate of P.V., Cline still denies that P.V. was eleven years old when he sexually abused P.V. Despite all this, the government does not object to granting the third level contemplated by USSG §3E1.1(b). Cline's acceptance, however, does not warrant a downward variance.

---

[6] The government also expended time and resources speaking with foreign and local law enforcement in anticipation of the motions to suppress, however, the government acknowledges the Guidelines definition of "preparing for trial" does not include actions taken in preparation for pre-trial litigation.

**B. Argument for 235 to 293 months' imprisonment**

A guidelines sentence of 235 to 293 months' imprisonment is necessary because it is the correct guidelines sentence and is supported by the 3553 sentencing factors. *See* 18 U.S.C. § 3553(a).

**A. Nature and Circumstances of the Offenses**

Cline's conduct of using his status and privilege to exploit impoverished children in a foreign country for his own sexual desires is reprehensible. Although this Court must consider other factors beyond the offense conduct, this Court should nonetheless give significant weight to his offense conduct in crafting his sentence here. *See, e.g.*, *United States v. Croteau*, 819 F.3d 1293, 1309 (11th Cir. 2016) ("The weight given to any specific § 3553(a) factor is committed to the sound discretion of the district court."). Cline's conduct was not a solitary lapse in judgment, but calculated and premediated. He did it repeatedly. He travelled around, moved locations he was staying, but returned again and again to exploit the children begging on the streets of Cambodia. Cline, who possessed a trove of images depicting the sexual abuse of children, when given the chance to act out what he had collected, chose to create his own victims. By sexually abusing the four minor victims again and again, the defendant has likely wreaked upon the victims a lifetime of emotional damage. And none of this accounts for the additional children Cline re-victimized by possessing images of their own sexual abuse to feed his sexual gratification. The nature and circumstances of Cline's crimes justify a lengthy guidelines sentence.

### B. History and Characteristics of the Defendant

Without diminishing the severity of child abuse that Cline both witnessed and endured during childhood, Cline reports maintaining a strong relationship with his mother throughout his lifetime and having a good stepfather as a father figure. PSR ¶ 90-92. Cline reports being advanced for his age, graduating high school a year early, completing law school and practicing as a lawyer for many years. PSR ¶ 105-109, 115-118. Cline reported regular employment throughout most of his adult life until he chose to stop working completely so that he could travel full-time. PSR ¶ 112-119. There is nothing in his history that accounts for his predatory behavior, other than his pedophilic sexual desires.

### C. Seriousness of the Crime, Promoting Respect for the Law, and the Need for Just Punishment

"Child sex crimes are among the most egregious and despicable of societal and criminal offenses…" *United States v. Sarras*, 575 F.3d 1191, 1220 (11th Cir. 2009) (discussing how courts have upheld lengthy sentences in cases involving child sex crimes as substantively reasonable). It is axiomatic that hands-on sexual abuse inflicts upon its victim enormous, devastating, and long-lasting harm. That the abuse is inflicted on a child adds a devastating dimension to the harm ordinarily inflicted on rape victims.

This Court's sentence must reflect the need to "promote respect for the law." 18 U.S.C. § 3353(a)(2)(A). When Congress passed the Protection of Children against Sexual Exploitation Act of 1977, it sought to address the organized, nationwide child

pornography industry that was generating millions of dollars through the exploitation of children. S. REP. 95-438, 5, 1978 U.S.C.C.A.N. 40, 42-43. The Act was aimed at filling a void in federal law by targeting the production of materials depicting child abuse. S. REP. 95-438, 5, 1978 U.S.C.C.A.N. at 56. But the Act, and its later amendments, are more than prophylactic measures. They reflect value judgments and accepted moral norms of our society. As one Senate Judiciary Committee report concluded: "the use of children…as the subjects of pornographic materials is very harmful to both the children and the society as a whole," describing the conduct as "outrageous." S. REP. 95-438, 5, 1978 U.S.C.C.A.N. at 43. Indeed, child sexual abuse "is grossly intrusive in the lives of children and is harmful to their normal psychological, emotional and sexual development in ways which no just or humane society can tolerate." *See Kennedy v. Louisiana*, 554 U.S. 407, 468 ((Alito J., joined by Roberts, C.J., Scalia, and Thomas, JJ., dissenting) (quoting C. Bagley & K. King, Child Sexual Abuse: The Search for Healing 2 (1990)).

"Retribution is a valid penological goal." *Glossip v. Gross*, 135 S. Ct. 2726, 2769 (2015) (Scalia, J. concurring). As the Eleventh Circuit explained in *U.S. v. Irey,* 612 F.3d 1160, 1206 (11th Cir. 2010): "the greater the harm the more serious the crime, and the longer the sentence should be for the punishment to fit the crime." 612 F.3d at 1206. Punishment is the way in which society expresses denunciation of wrongdoing, and it is thus essential that this Court promote and maintain respect for the law by pronouncing sentences that fully reflect society's revulsion. *See Gregg v. Georgia*, 428 U.S. 153, 184 n. 30 (1976) (citing Royal Commission on Capital

Punishment, Minutes of Evidence, Dec. 1, 1949, p. 207 (1950)). In the same vein, Congress has expounded that the "just deserts" concept in sentencing is a means of reflecting the "gravity of the defendant's conduct," as well as the "harm done or threatened by the offense." S.Rep. No. 98-225, at 75-76, 1984 U.S.C.C.A.N. 3258-59.

The defendant's actions violated federal law, but they also transgressed accepted social norms that undergird our laws. His conduct was unnatural, morally repugnant, and incompatible with a well-ordered society. Cline was a lawyer, a position of trust within the community, yet he chose to travel to foreign country, take advantage of children begging in the street by paying them to engage in sexual contact with him, all while hoarding a collection of pictures and videos of the sexual abuse of countless other children. Cline chose to prey upon one of the most vulnerable communities in the globe—the impoverished children of one of the world's least developed countries. At least one of the victims describes this dire situation the Defendant exploited, explaining "I was living in poverty and had very few possessions, and I felt I had no other choice." That victim described blaming herself for the defendant's predation because she accepted his money after the abuse. Another victim said the blame she internalized for the defendant's abuse was so extreme that she wanted to end her own life. Each of the victims describes feeling shame and embarrassment and ostracization in their community. One victim described how the stress caused her severe headaches and stomach aches to the point of vomiting, nightmares, and an inability to focus on school. She felt the need to

isolate herself because the defendant left her feeling like she had "no value" or "was dirty." This abuse will have life-long impacts on all four of his victims. There is only one person to blame for the trauma these victims suffered—it is not any of the children themselves—only the Defendant.

It is critical that the Court's sentence reflect the seriousness of the lasting impact of the defendant's abuse on the victims, but also that it stand as a warning that the powerful in America cannot travel the globe exploiting the vulnerable without facing substantial punishment. A guidelines sentence would do just that and is essential due to the seriousness of the crime, to promote respect for our laws and as just punishment.

D. **Conclusion**

A guidelines sentence of 235 to 293 months in prison is required to reflect the seriousness of Cline's crimes, afford adequate deterrence to criminal conduct and protect the public from further crimes by Cline.

Respectfully submitted,

SARA C. SWEENEY
Acting United States Attorney

By: /s/ *Courtney Derry*
Courtney Derry
Assistant United States Attorney
Florida Bar No. 41125
E-mail: Courtney-derry@usdoj.gov

/s/*Ilyssa M. Spergel*
Ilyssa M. Spergel
Assistant United States Attorney
Florida Bar No. 0102856
400 N. Tampa Street, Suite 3200
Tampa, Florida 33602-4798
Telephone: (813) 274-6000
Facsimile: (813) 274-6358
E-mail: ilyssa.spergel@usdoj.gov

Gwendelynn Bills
Trial Attorney
Tennessee Bar No. 034150
U.S. Department of Justice
Child Exploitation and Obscenity Section
1301 New York Avenue N.W.
Washington, D.C. 20005
Telephone: (202) 514-5780
Facsimile: (202) 305-4320
E-mail: Gwendelynn.E.Bills@usdoj.gov

U.S. v. Rugh James Cline  Case No. 8:21-cr-00081-CEH-LSG

## **CERTIFICATE OF SERVICE**

I hereby certify that on February 28, 2025, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to counsel of record.

/s/ *Courtney Derry*
Courtney Derry
Assistant United States Attorney
Florida Bar No. 41125
400 N. Tampa Street, Suite 3200
Tampa, Florida 33602-4798
Telephone: (813) 274-6000
Facsimile: (813) 274-6358
E-mail: Courtney.derry@usdoj.gov